STATE v. W. H. COYLE *et al.*

Nos. A-662, A-663.  Opinion Filed March 19, 1912.

(122 Pac. 243.)

1.     STATUTES — Constitutional Law — Partial Invalidity of Act — Equal Protection of Laws.  The Legislature passed an act approved June 6, 1908, commonly called the Labor Act, which provided: ''Sec. 2.  No agreement, combination or contract by or between two or more persons to do or procure to be done, or not to do or procure to be done, any act in contemplation or furtherance of any trade dispute between employers and employees in the state of Oklahoma, shall be deemed as criminal nor shall those engaged therein be indictable or otherwise punishable for the crime of conspiracy, if such act committed by one person would not be punishable as a crime, nor shall such agreement, combination or contract be considered as in restraint of trade or commerce, nor shall any restraining order or injunction be issued with relation thereto.  Nothing in this act shall exempt from punishment otherwise than is herein excepted, any person guilty of conspiracy for which punishment is now provided by an act of the Legislature, but such act of the Legislature shall as to the agreement, combination and contracts hereinbefore referred to, be construed as if this act was therein contained:  Provided, that nothing in this act will be construed to authorize force or violence.'' (Laws 1907-08, c. 53, art. 2, Comp. Laws 1909, sec. 4042).  And passed another act approved June 10, 1908, commonly called the Anti-Trust Act, prescribing in section 1:  ''That every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state, which is against public policy, is hereby declared to be illegal.'' (Laws 1907-08, c. 83, art. 1 [Comp. Laws 1909, sec. 8800]).

**Held,** (a) That the Legislature intended that the provisions of said section 2 and the provisions of the Anti-Trust Act should constitute one whole, and if both could not be carried into effect, neither would have received legislative sanction.

(b) That said section 2 and the Anti-Trust Act so considered is not in violation of the Constitution of this state, nor of that of the United States, and is not in contravention of the fourteenth amendment, guaranteeing the equal protection of the laws, and that both are within the scope of legislative power and authority.

2. **CONSTITUTIONAL LAW—Distribution of Governmental Powers —Judicial Powers—Validity of Statute.** The courts cannot annul or pronounce void any act of the Legislature upon any other ground than that of repugnancy to the Constitution of the United States or of the state.

3. **SAME—Determining Validity of Statutes—Presumptions.** Every legislative act is presumed to be constitutional, and the courts should not declare an act to be unconstitutional unless it is clearly so. If there is doubt, the expressed will of the Legislature should be sustained.

4. **COURTS—Rules of Decision—Former Decision.** The construction of a statute in a civil proceeding is authority for a like construction in a criminal prosecution.

5. **MONOPOLIES—Trusts—"Public Policy."** The courts must look to the Constitution and the statutes to determine the public policy of the state on a given subject, hence the words "public policy," as used in section 1 of the Anti-Trust Act of June 10, 1908 (Laws 1907-08, c. 83, art. 1 [section 8800, Comp. Laws 1909]), are interpreted to mean the law of the state, whether found in the Constitution or the statutes. A constitutional statute cannot be contrary to public policy, since it is public policy.

6. **INDICTMENT AND INFORMATION—Duplicity—Conspiracy in Restraint of Trade.** An indictment under section 1 of the Anti-Trust Act of June 10, 1908 (Laws 1907-08, c. 83, art. 1 [section 8800; Comp. Laws 1909]), charging a conspiracy in restraint of trade, is not bad for duplicity, on the theory that it alleges what was agreed to be done, and the acts to have been done in pursuance of the alleged conspiracy.

7. **MONOPOLIES—Criminal Prosecutions—Indictment—Time of Offense.** An indictment under said section 1 of the Anti-Trust Act (Laws 1907-08, c. 83, art. 1 [Comp. Laws 1909, sec. 8800]), charging a conspiracy in restraint of trade, sufficiently sets out the time, when it alleges the time when the several acts relied on to establish the offense were done, and it is not essential to set out the precise time when the conspiracy was formed.

8. **STATUTES—Irrepealable Law.** The Legislature cannot pass an irrepealable law.

9. **STATES—Trusts—Statutory Provision.** The Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) does not continue in force in Oklahoma since statehood.

(Syllabus by the Court.)

*Appeals from District Court, Logan County;*
*A. H. Huston, Judge.*

W. H. Coyle and others were indicted for violation of the Anti-Trust Law of June 10, 1908. From judgments sustaining demurrers to the indictment, the state appeals. Reversed and remanded.

Omitting the captions and indorsements, the indictments read as follows:

"Indictment No. A-662. At the July term, a term of the district court of the Eleventh judicial district of the state of Oklahoma, held in and for Logan county, in the state of Oklahoma, at the city of Guthrie, and begun on the 26th day of July, in the year of our Lord one thousand nine hundred and nine, the jurors of the grand jury of the said county, good and lawful men, then and there returned, tried, impaneled, sworn, and charged according to law to diligently inquire into and true presentment make of all public offenses against the laws of the state of Oklahoma, committed or triable within said county, upon their said oaths, in the name and by the authority of the said state of Oklahoma, do present and find that in said county of Logan, in said state of Oklahoma, on the 15th day of November, 1907, and continuously from said date up to the filing of this indictment, the defendant The Southwestern Cotton Oil Company was and now is a corporation organized and existing and doing business under the laws of the state of Oklahoma; that the defendant Houghton & Douglas Cotton Company was and now is a corporation organized and existing and doing business under the laws of the state of Oklahoma; that the defendant W. H. Coyle Consolidated Companies was and now is a corporation organized, existing, and doing business under the laws of the state of Oklahoma; that the defendant W. H. Coyle Oil Co. was and now is a corporation organized, existing, and doing business under the laws of the state of Oklahoma; and that the Cawthon Cotton Company was and is a corporation organized, existing, and doing business under the laws of the state of Oklahoma; and that they, together with W. H. Coyle, E. E. Houghton, R. A. Vose, W. O. Cawthon, E. Cook, J. M. Aydelotte, and P. A. Norris, G. Z. Page, and other persons, to the grand jurors unknown, committed the following acts, entered into the following conspiracies, combinations in the form of a trust or pool, made the following agreement, contract with

the intent to restrain trade and commerce in Logan county, in said state, in cotton and the products thereof, each and all of which was and is against public policy, and in so doing each and all of whom, together and singular, acted illegally, wrongfully, intentionally, and feloniously, and with the intent of monopolizing the market for and of cotton and its products and to control and regulate the prices thereof, unreasonably in restraint of trade and commerce therein and against public policy, that is to say: They and each of them, acting together and singly, have sought to acquire and have acquired a virtual monopoly in the marketing and ginning of cotton and seed cotton and in the marketing of the products thereof, in that they, acting together and singly, through various contracts, agreements, and understandings, had among themselves, the exact nature whereof is to the grand jurors unknown, have acquired control of about 90 per cent. of all the gins operating in said county, and ginning the cotton and seed cotton produced in said county, and have among themselves divided the field and the territory in the marketing and purchasing of cotton and its products, with the intent of feloniously stifling competition therein, that is to say: That at the town of Lovell, Okla., in said county of Logan, there is a gin operated and controlled by the Southwestern Cotton Oil Company, operated under an understanding and agreement between said defendants that the cotton seed shall be acquired by the Southwestern Cotton Oil Company, and that another gin located at said town of Lovell, owned by Houghton & Douglas Cotton Company, shall not be operated, and that at the town of Seward a cotton gin, operated and controlled by the Southwestern Cotton Oil Company shall be so operated so that all the cotton seed there ginned from seed cotton shall be acquired by Houghton & Douglas Cotton Company; and that another gin located at the said town of Seward, owned by Houghton & Douglas Cotton Company, shall not be operated; and that at the town of Meridian a cotton gin, owned and operated and controlled by defendant W. H. Coyle, W. H. Coyle Consolidated Companies, and W. H. Coyle Oil Company, shall be operated and all the cotton seed ginned from seed cotton at that point shall be acquired by said W. H. Coyle, W. H. Coyle Consolidated Companies, and W. H. Coyle Oil Company; and that another gin located at said town of Meridian, owned by Houghton & Douglas Cotton Company, shall not be operated.; there being at the towns aforesaid only the two aforesaid gins in each case, and that in the city of Guthrie that cotton shall be so bought and purchased by said defendants that

the Cawthon Cotton Company, Houghton & Douglas Cotton Company, W. H. Coyle, W. H. Coyle Consolidated Companies, and W. H. Coyle Oil Company shall acquire as nearly as practicable one-third each of the amount of cotton sold upon the market, without competitive bidding therefor, and that of all the cotton seed ginned from cotton in the city of Guthrie one-third of the same shall be acquired by the Southwestern Cotton Oil Company, Houghton & Douglas Cotton Company, and W. H. Coyle, W. H. Coyle Consolidated Companies, and W. H. Coyle Oil Company, the said three defendants last-named to be considered as one unit; and that at other points throughout Logan county the total production of cotton and cotton seed shall be divided, without competitive bidding, and regarding Cawthon Cotton Company and the Southwestern Cotton Oil Company as one unit, Houghton & Douglas Cotton Company as one unit, and W. H. Coyle, W. H. Coyle Consolidated Companies, and W. H. Coyle Oil Company as one unit, each of said units shall acquire one-third of the total production of cotton and cotton seed as far as the same may be effected, and other buyers of both lint cotton, seed cotton, and cotton seed excluded from the market in Logan county; and that at other points, without and near the borders of Logan county, to wit, at Fallis, in Lincoln county, said defendants have acquired the control of all the gins owned, operated, and controlled at said point, so as to effect the aforesaid felonious and equal distribution of cotton and its products among themselves, with the intent to restrain trade and to regulate the price of cotton and its products in Logan county, and for the purpose aforesaid have associated with them J. A. Bellis, and he, said J. A. Bellis, has acquired by lease the single and only cotton gin at the town of Shiloh between said Meridian and said Fallis, there being no other town and no other cotton gin so situated as to acquire the trade in cotton between Guthrie and Fallis, and there being no other cotton gin situated between Guthrie and the southern border of the county of Logan so situated that it may acquire trade in cotton and its products. and there being no other cotton gins between Guthrie and Lovell so situated that it may acquire a trade in cotton and its products, and there being no cotton gins southwest from Guthrie to the southwest corner of the county of Logan; and all the cotton gins from Guthrie northeast to the northeast corner of the county of Logan are controlled and sought to be controlled by the defendants and each of them in pursuance to the said felonious intent to control and regulate the trade in cotton and its products

in said county; that at Crescent, between said Lovell and said Guthrie, the three gins there situated are owned and controlled by said defendants and operated in pursuance of said felonious design aforesaid; and that defendants then and there by said acts have completely annihilated competition in cotton and its products in the county of Logan except at the town of Mulhall and a very small portion of the northeastern portion of the county of Logan, and by associatiating together with themselves and associating themselves in the common ownership of the Commonwealth Cotton Oil Company at Cushing, Okla., and the gins feeding the same, and by associating with themselves through a joint ownership, contracts, and understandings, the exact nature of which is to the grand jury unknown, with the persons who own and control the Choctaw Cotton Oil Company of Shawnee, Okla., and the New State Brokerage Company of Shawnee, Okla., and the Chickasha Cotton Oil Company of Chickasha, Okla., and the Oklahoma Cotton Oil Company of Oklahoma City, Okla., and the Farmers' Cotton Oil Mill Company at Guthrie, Okla., and by controlling the gins of the Logan County Co-Operative Association and acquiring the same with the said intent, all the territory and market in cotton and its products in Logan county, during all the dates aforesaid, has been and is now divided and distributed between said defendants for the said felonious purpose of restraining trade in cotton and its products in the county of Logan and elsewhere, contrary to the form of the statute in each case made and provided and against the peace and dignity of the state. Chas. West, Attorney General. James Hepburn, County Attorney, Logan County."

"Indictment No. A-663. At the July term, a term of the district court of the Eleventh judicial district of the state of Oklahoma, held in and for Logan county, in the state of Oklahoma, at the city of Guthrie, and begun on the 26th day of July, in the year of our Lord one thousand nine hundred and nine, the jurors of the grand jury of the said county, good and lawful men, then and there returned, tried, impaneled, sworn, and charged, according to law, to diligently inquire into and true presentment make of all public offenses against the laws of the state of Oklahoma, committed or triable within said county, upon their said oaths, in the name and by the authority of the said state of Oklahoma, do present and find that in said county of Logan, in said state of Oklahoma, on the 18th day of September, 1909, and continuously from said date up to the filing of this indictment, the defendant the Southwestern Cotton Oil Company was and is a corporation

organized and existing and doing business under the laws of the state of Oklahoma; that the defendant Houghton & Douglas Cotton Company was and is a corporation organized and existing and doing business under the laws of the state of Oklahoma; that the defendant W. H. Coyle Consolidated Companies was and is a corporation organized, existing, and doing business under the laws of the state of Oklahoma; that the defendant W. H. Coyle Oil Company was and is a corporation organized, existing, and doing business under the laws of the state of Oklahoma; and that the Cawthon Cotton Company was and is a corporation organized, existing, and doing business under the laws of the state of Oklahoma; that in the incorporated town of Crescent in the county of Logan, and in the neighborhood and vicinity and community in which said town is situated, the production of cotton, cotton seed, and seed cotton is and was the principal business, and the planting, raising, harvesting, picking, ginning, selling, buying, transporting, trafficking in cotton, cotton seed, and products thereof, was and is the principal industry thereof, and by reason of its nature and extent the said business is and was such that the manner in which the ginning, and purchasing, and selling of the same was and is a matter of public consequence and did and does affect said community at large, and that at said time and place said defendants had and exercised a virtual monopoly in the gin business, and the trafficking in seed cotton, cotton seed, and the products thereof; that then and there said W. H. Coyle and W. H. Coyle Consolidated Companies and W. H. Coyle Oil Company had, owned, and operated a cotton gin; that then and there F. E. Houghton, E. Cook, A. T. Beunting, and Houghton & Douglas Cotton Company had, owned, and operated a cotton gin, and that then and there R. A. Vose, W. O. Cawthon, the Southwestern Cotton Oil Company, and the Cawthon Cotton Company had, owned, operated, and controlled a cotton gin; that said three last named cotton gins aforesaid were and are the only cotton gins operated in said community and were and are operated as custom cotton gins, that is to say, theretofore and before the time herein mentioned, the same were operated for the ginning of cotton other than that belonging to or in the control of the owner and operator of said gin and gins; that at said time aforesaid, with the intent to restrain trade and commerce in the marketing of cotton, seed cotton, cotton seed, and the products thereof, then and there said defendants committed an act and entered into an agreement and contract among themselves and with one another and into a combination in the

form of a trust and into a conspiracy in restraint of trade and commerce then and there, which was and is against public policy, in the following form and manner, that is to say: Said defendants agreed among themselves and with one another, with the intent aforesaid then and there and with the intent to restrict prices and to restrain trade, that neither nor any of said gins should gin cotton or cotton seed or seed cotton, for any buyer thereof except one of themselves, said defendants, and with the intent aforesaid then and there did by their act, agreement, contract, combination among themselves, and conspiracy in restraint of trade and commerce, then and there refuse to gin cotton, cotton seed, seed cotton, and the products thereof, for any buyer of cotton, cotton seed, seed cotton, and the products thereof, except one of them, said defendants. And on the 2d day of October, 1909, then and there said defendants, in pursuance of said act, agreement, contract, combination in the form of a trust and otherwise, and said conspiracy in restraint of trade and commerce, then and there among themselves with the intent of restraining trade, and with the intent of restricting the price of cotton, cotton seed, and seed cotton, did simultaneously and together raise and increase the charge for ginning cotton from the price theretofore charged since the —— day of October, 1909, of $3.50 per bale of lint cotton, and 17 cents per hundred pounds of seed cotton, to the price of $5 per bale for lint cotton; that said charge for ginning seed cotton of $5 per bale was and is an unreasonable price and charge and is and was then and there by said defendants so fixed and charged with the intent to restrain trade and commerce then and there in the traffic and business aforesaid, and was and is against public policy; that the said refusal by said defendants to gin the cotton of buyers other than the said defendants was and is an act of discrimination and against public policy, with the intent to restrain trade and commerce in said traffic and business then and there; that at the times aforesaid, the gins aforesaid of the said defendants, at the said place and in the said community aforesaid, had the facility to gin the said cotton so as aforesaid by them, said defendants, refused to be ginned; that the said refusal on the part of said defendants then and there was not the rendition of their services as such ginners adequate to the needs of the public, and that all of the said acts, conspiracies, combinations, contracts, and agreements are and were conspiracies, contracts, combinations, agreements, and acts to restrain trade and commerce in the business and traffic of cotton, and were done by the defendants then

and there contriving and intending unlawfully and feloniously to restrain and prevent competition among the defendants, ginners and purchasers of cotton, and each of them in respect to such trade in cotton and the products thereof, and with the intent to fix the selling price thereof, and contriving and intending unlawfully to deprive the public of the advantages of the carrying on of such trade through the independent action of the defendants, said ginners of cotton aforesaid; the said defendants R. A. Vose, W. O. Cawthon, Cawthon Cotton Company, and the Southwestern Cotton Oil Company in all of said acts, agreements, combinations, conspiracies aforesaid, acting in and through P. J. Hess, then and there their agent authorized by them, said R. A. Vose, W. O. Cawthon, Cawthon Cotton Company, and the Southwestern Cotton Oil Company, to do and commit the said acts aforesaid; that the said defendants W. H. Coyle and W. H. Coyle Consolidated Companies and W. H. Coyle Oil Company in all of the said acts, conspiracies, combinations, agreements, and contracts aforesaid then and there acted in and through Ed Snell, then and there their agent authorized by them, said W. H. Coyle, W. H. Coyle Consolidated Companies, and W. H. Coyle Oil Company, to do all of said acts aforesaid; and said defendants F. E. Houghton, E. Cook, A. T. Beunting, and Houghton & Douglas Cotton Company in all of said acts, conspiracies, combinations, agreements, and contracts acted in and through Ed Stobaugh authorized by them, said F. E. Houghton, E. Cook, A. T. Beunting, and Houghton & Douglas Cotton Company, to do all of said acts aforesaid; and the said Ed Stobaugh, P. J. Hess, and Ed Snell, being then and there in said county of Logan and state of Oklahoma, did then and there unlawfully, knowingly, willfully, and feloniously engage in and enter into said unlawful combination and conspiracy, each defendant aforesaid and its aforesaid agents with the other defendants and their aforesaid agent, to restrain trade carried on by said defendants and each of them, and to stop and hinder any and all competition theretofore existing then and there among each of said cotton gin owners and operators, and then and there existing at said town of Crescent, by the unification of their interest in the purchase of cotton, seed cotton, and cotton seed in the said town of Crescent in the following manner and by the following means: That it was then and there by said defendants and among them and their agents understood and agreed that one-third of all lint cotton ginned from cotton seed, bought and sold, transported from, trafficked in and dealt in, in the town of Crescent should be bought

by, sold to, and acquired by each of the following defendants, to wit, W. H. Coyle Consolidated Companies and W. H. Coyle Oil Company, Houghton & Douglas Cotton Company, and Cawthon Cotton Company; that likewise and at the same time and place then and there with the said intent aforesaid it was then and there agreed, understood, and contracted among said defendants and their agents one with another that one-third of all of the cotton seed ginned from said cotton in said town of Crescent should be sold to, bought by, and acquired by each of the following defendants, to wit, W. H. Coyle Consolidated Companies and W. H. Coyle Oil Company, Houghton & Douglas Cotton Company, and the Southwestern Cotton Oil Company; that said Cawthon Cotton Company is and was in truth and in fact the purchasing agent of lint cotton, and the Southwestern Cotton Oil Company the purchasing agent of cotton seed in the town of Crescent, and that the owners, stockholders, and person who owned and controlled the Southwestern Cotton Oil Company for the acquisition of cotton seed and the marketing of it owned and controlled, substantially then and there, the Cawthon Cotton Company for the acquisition of lint cotton and trafficking in it, with the intent and purpose that in all of the products of cotton and cotton seed in the town of Crescent one-third of all should go to each of the said corporations and combinations aforesaid; the said Houghton & Douglas Cotton Company being a dealer in both cotton and cotton seed, and the said W. H. Coyle Consolidated Companies being then and there a dealer in both lint cotton and cotton seed, and in all of said acts with the intent aforesaid by the unification of the interests of defendants in the purchase of cotton and the products thereof, in the said town of Crescent, to prevent competition in cotton and the products thereof by any person other than the defendants and their agents, to the intent and effect that said defendants and their agents might purchase lint cotton and cotton seed at the cheapest possible figure and might restrain trade and commerce and restrict the price of such cotton, cotton seed, and the products thereof, against public policy, not adequate to the needs of the public by said discrimination and said unreasonable charges for ginning, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Oklahoma. Chas. West, Attorney General. James Hepburn, County Attorney, Logan County."

On their arraignment, the defendants interposed demurrers to the indictments. The grounds of the demurrers filed by the several defendants in each case are the same, as follows:

"(1) That the grand jury by which said indictment was found had no legal authority to inquire into the offense charged by reason of its not being within the legal jurisdiction of the county. (2) That said indictment does not substantially conform to the requirements of the Code of Criminal Procedure of the state of Oklahoma, nor to the act entitled 'Trusts and Combinations,' being chapter 113 of the Compiled Laws of Oklahoma 1909, nor to any other law or statute of said state. (3) That more than one offense is charged or sought and attempted to be charged in the indictment. (4) That the facts stated do not constitute a public offense. (5) That the indictment contains matter which, if true, would constitute a legal justification or excuse of the offense charged and a legal bar to the prosecution. (6) Because it appears from the face of said indictment that the statute of the state of Oklahoma, upon which the indictment is based, is in conflict with the fourteenth amendment of the Constitution of the United States and deprives this defendant of the benefits guaranteed him by said amendment, wherein it is provided that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Both cases were argued and submitted together in the district court, and the court passed on the demurrers to the indictments in both cases at the same time.

In the first case the court gave judgment as follows:

"The court is of the opinion that said demurrers ought to be sustained, and hereby sustains said separate demurrers to the indictment. And thereupon the court rendered judgment for the defendants discharging them hence without day."

In the second case the court gave judgment as follows:

"The court is of the opinion that said demurrers ought to be sustained. And the court hereby sustains the separate demurrer of each of said defendants and orders the defendants in said cause held under their present bonds until the matter of making an unlawful discrimination may be submitted to another grand jury of this court."

Statement of Facts.

Judging from the opinion of the court as set forth in the defendants' brief, the court's reasons for sustaining the demurrers may be in substance briefly stated as follows: The indictment in the first case is defective because: First, no time is alleged when the offense was committed; second, because of duplicity, more than one offense being charged; third, the law under which the indictment was drawn is unconstitutional, or, at least, insufficient upon which to predicate a crime. The indictment in the second case is defective: First, because of duplicity, more than one offense being charged; second, because the law under which the indictment was drawn is unconstitutional, or, at least, insufficient upon which to predicate the crime attempted to be charged. Exceptions to the judgments sustaining the demurrers were taken and allowed. The judgments were entered January 31, 1910. The state appealed from the judgment in each case, and in the petitions in error aver:

"That there was error in the action of the district court in sustaining the demurrers of the defendants to the indictment, all of which more clearly appears from the case-made."

The causes were by agreement treated as consolidated, and by order of the court advanced and assigned for oral argument and final submission at the November, 1910, term, at which time time the cause was briefed and argued orally. Subsequently the order of submission was set aside, and the cause came on in regular order for final submission. Owing to the great importance of the questions involved, and a change in the personnel of the court and because of the decision of the Supreme Court of the United States on a cognate question, it was ordered that the cause be again assigned for oral argument. At the November, 1911, term the cause was again argued orally, and very able, elaborate, and extensive briefs submitted by counsel for defendants, and the Attorney General.

*Chas. West,* Atty. Gen., and *James Hepburn,* Co. Atty. (C. J. Davenport, of counsel), for the State.

*Dale, Bierer & Hegler, C. G. Hornor, Flynn, Ames & Chambers,* and *Devereux & Hildreth,* for defendants in error.

DOYLE, J. (after stating the facts as above). The defendants were indicted in the district court of Logan county in two cases, October 23, 1909, for violations of section 1, art. 1, c. 83, act approved June 10, 1908, p. 750. Sess. Laws 1907-08 (section 8800, Comp. Laws 1909).

On arraignment each of the defendants interposed and filed separate demurrers exactly identical in each case. Upon considering the demurrers, the court gave judgment in each case sustaining the same. From said judgments the state appeals.

Section 44, art. 5, of our state Constitution, prescribes:

"The Legislature shall define what is an unlawful combination, monopoly, trust, act, or agreement, in restraint of trade, and enact laws to punish persons engaged in any unlawful combination, monopoly, trust, act, or agreement, in restraint of trade, or composing any such monopoly, trust, or combination."

The title and text of the act passed pursuant to the constitutional direction is as follows:

"An act to define a trust, monopoly, unlawful combination in restraint of trade; to provide civil and criminal penalties and punishment for violation thereof and damages thereby caused; to regulate such trusts and monopolies; to promote free competition for all classes of business in the state; and declaring an emergency.

"Be it enacted by the people of the state of Oklahoma.

"Section 1. That every act, agreement, contract, or combination in the form of trust, or otherwise, or conspiracy in restraint of trade or commerce within this state, which is against public policy, is hereby declared to be illegal.

"Sec. 2. If the Attorney General shall have sufficient evidence that the provisions of the Constitution, or any law pursuant thereto against the establishment or maintenance of any trust, monopoly or unreasonable restraint of trade, or any violation of this act, or any of its provisions, are about to be or have been violated by any person, firm, corporation or association engaged in any quasi-public business or having a virtual monopoly of any commodity or business with the intention or effect of destroying competition or restraining trade, contrary to the provisions of this act, he may file information in the Supreme Court, and by proceeding as against nuisance, enjoin and restrain said combination or arrangement, or any of its members, or by a proceeding analogous to libel, cause any or all the personal property of said

offending person, firm or corporation or association, used or to be used, in whole or in part, in any transaction which, in effect or intent, hinders competition, or unreasonable restriction of trade, to be forfeited to the state in the discretion of the court, together with all the commodities in the possession or control of such offending corporation, person, firm or association, used or intended for such use in violation of the Constitution or laws pursuant thereto, or this act; and may take both said proceedings. Upon the filing of such petition, or at any time thereafter, the Attorney General may apply for an injunction pending the action, and the appointment of a receiver for any or all of the property of such person, firm, corporation or association. Upon such application, the court, or a majority of the judges thereof, if in vacation, is authorized to issue a restraining order pending the action, enjoining the defendant or defendants from in any way changing the business, records, books, instruments or property to them belonging, or by them used, directly or indirectly, and issue a rule to show cause why a receiver should not be appointed, and after notice of such rule shall have been served on the defendant or defendants or any managing agent of said defendant or defendants within this state, and an opportunity to be heard having been given, said receiver may be appointed in the discretion of the court, to take charge of the property of the defendant or defendants so notified. Such receiver shall preserve said property free from any illegal arrangement until the termination of the litigation, and thereafter to dispose of the same according to law, or any other remedy may be applied, or both, to more effectually produce and consummate such preservation or forfeiture or both; and said court shall be authorized by appointed master in chancery, or otherwise, in its discretion, to receive evidence in any county in the state, according to the rules of civil procedure, and make findings of fact thereon for said court; and said master in chancery shall have compulsory process for witnesses, and the production of books and papers from any part of the state, and for this purpose the executive officers of the said court, or any of the district courts of this state, shall be empowered to serve mesne and final process; and the services of said master in chancery, or other person appointed by the court, shall be paid for as costs by the losing parties in said cause, in an amount equal to the fees that would have been earned therein if a notary public had received said testimony, together with a sum of not exceeding ten dollars ($10.00) per day, in the discretion of the court, and the actual expenses for each day that testimony is actually received, and testimony and evidence in

such action may also be taken by deposition anywhere within or without this state, as in civil actions in the district court. In the event of a violation of any order of the court therein, and a proceeding grows out of the same in the nature of contempt, if the defendant· demand a trial by jury, the court may transfer the said contempt proceedings to any district court of the state for trial by jury and a verdict, but the judgment, if any, shall be rendered by said Supreme Court, and sentence, if proper, passed by it. This proceeding shall be in addition to, and cumulative as to any other provisions of the law applicable to the same situation. Provided, that the appointment of such receiver may be stayed, or after appointment and possession taken the receiver shall be discharged, upon the defendant giving bond in an amount, and with the sureties to be approved by said court or a justice thereof, conditioned for the payment of all damages and costs which may be assessed against the defendant in said proceeding in favor of the state, or any officer or person.

"Sec. 3. Any person, firm, corporation or association, who shall be injured in his or their busienss or property by any other person, firm, corporation or association, by reason of anything forbidden, or declared to be unlawful by this act, may sue therefor in the courts of this state, and shall recover threefold the damages by him or them sustained, and the cost of suit, and a reasonable attorney's fee, to be fixed by the court.

"Sec. 4. Every foreign corporation, as well as every foreign association exercising any of the powers, franchises or functions of a corporation in this state, violating any of the provisions of this act, is hereby denied the right and prohibited from doing business in this state, and. the secretary of state, upon the order of the Corporation Commission, or any competent court, made after due notice, and in due course of law, shall revoke the license of any such corporation or association heretofore authorized to do business in this state.

"Sec. 5. It shall be unlawful for any person, firm, corporation or association engaged in the production, manufacture, distribution or sale of any commodity of general use, or rendering any service to the public, to discriminate between different persons, firms, associations or corporations, or different sections, communities or cities of the state by selling such commodity, or rendering such service at a lower rate in one section, community, or city than another, or at the same rate or price at a point away from that of production or manufacture as at the place of production or manufacture, after making due allowance for the difference, if any, in the grade, quantity or quality, and in the actual

7 Cr.—2

costs of transportation from the point of production or manufacture, if the effect or intent thereof is to establish or maintain a virtual monopoly hindering competition, or restriction of trade.

"Sec. 6. Any person who shall violate any of the provisions of this act, or take part, or aid, or advise in the violation of any such provisions, or who shall, as officer, manager, director, agent, servant or employee of any firm, corporation or association, knowingly carry out any of the stipulations, purposes, prices, rates, or furnish any information, knowingly, to assist in carrying out such purposes, or in pursuance thereof, in violation of said provisions, shall be punished by a fine of not less than fifty dollars, nor more than ten thousand dollars, and by imprisonment not less than ten days, nor more than ten years, at the discretion of the court; and each day's violation of the provisions, or any of them, of this act, shall constitute a separate offense. And any sum which might be assessed as a fine by way of punishment for a crime as in this act provided, may be recovered by the state as a penalty in civil action in addition to, or irrespective of, the assessment and assessability of said fine, either before, after, or simultaneously with the pendency of said criminal action.

"Sec. 7. In any indictment or information for any offense named in this act, it is sufficient to state the purpose or facts of the trust, monopoly, unlawful combination in restraint of trade or commerce, and that the accused is a member of, acted with, or in pursuance of it, or aided or assisted in carrying out its purpose without giving its name, or description or stating how, when or where it was created.

"Sec. 8. It shall be the duty of the court before whom any proceeding under this act may be brought, upon the application of the Attorney General, to cause to be issued by the clerk of said court subpoenas for such witnesses as may be named in the application, and cause the same to be served by the sheriff of the county where or whither such subpoena is issued; and such witnesses shall be compelled to appear before such court or judge, at the time and place set forth in the subpoena, and shall be compelled to testify as to any knowledge they may have of the violations of any of the provisions of this act; and any witness who fails or refuses to attend and testify shall be punished as for contempt, as provided by law. Any person so subpoenaed and examined, shall not be liable to criminal prosecution for any violation of this act about which he may testify, neither shall the evidence of any such witness be used against him in any criminal proceeding. The evidence of all the witnesses shall, at the option of the Attorney General, be taken down and shall

be transcribed and placed in the hands of the Attorney General, and he shall be authorized to prosecute such violator or violators, of this act as the testimony so taken shall disclose, witnesses subpoenaed as provided in this act, shall be compelled to attend from any county in the state.

"Sec. 9. It shall be the duty of the county attorney of the several counties of this state, as well as the Attorney General of the state, to prosecute all actions to enforce the criminal provisions of this act.

"Sec. 10. It shall be unlawful for any person, partnership, firm, association, corporation or joint stock company, or agent thereof, to issue, or to own trust certificates, or for any person, firm, partnership, association, joint stock company or corporation, agent, officers, employee, or the director or stockholders of any corporation, association or joint stock company to enter into any combination, contract or agreement with any person or persons, corporations or associations, firm or firms, partnership or partnerships, or with any stockholder, director or officer, agent or employee of the same, the purpose or effect of which combination, contract or agreement shall be to place the management or control of such combination or combinations, or the conduct or operation of the same, or the output or manufactured product thereof, or the marketing of the same in the hands of any trust or trustees, holding corporation or association, firm or committee, with the intent or effect to limit or fix the price or lessen the production or sale of any product or article of commerce, or the use or consumption of the same, or to prevent, restrict, limit or diminish the manufacture or output of any such article of commerce, use or consumption, and every person, firm, partnership, association, joint stock company or corporation or any agent, employee, officer or director of the same, that shall enter into any such combination, contract, management or agreement for the purpose aforesaid, shall be deemed and adjudged guilty of conspiracy in restraint of trade, and punished as provided for in section 6 of this act, in so far as applicable, provided, this section shall not be construed to extend beyond the scope and meaning of section 1 of this act.

"Sec. 11. Every corporation who shall own, hold or control, in any manner whatever, the stock of any competitive corporation or corporations engaged in the same kind of business, in or out of this state, in violation of the Constitution and laws of this state, shall forfeit its charter or license to do business in this state, and shall be subject to a penalty of not less than one thou-

sand dollars, nor more than ten thousand dollars, to be recovered at the suit of the state in any court of competent jurisdiction.

'Sec. 12.    Whenever any corporation created under the laws of this state, or any foreign corporation authorized to do business in this state shall violate any law of this state, for the violation of which fines, penalties or forfeitures are provided, all property of such corporation within this state at the time of such violation, or which may hereafter come within this state, shall, by reason of such violation, become liable for such fines or penalties, and for all costs of suit, and of collection.    The state of Oklahoma shall have a lien on all such property from the date that suit shall be instituted by the Attorney General in any court of competent jurisdiction within this state for the purpose of forfeiting the charter or cancelling the permit of such corporation, or for the recovery of such fines or penalties, the institution of such suit for the recovery of such fines, penalties or forfeitures shall constitute notice of such lien.

"Sec. 13.    Whenever any business, by reason of its nature, extent, or the existence of a virtual monopoly therein, is such that the public must use the same, or its services, or the consideration by it given or taken or offered, or the commodities bought or sold therein are offered or taken by purchase or sale in such a manner as to make it of public consequence, or to affect the community at large as to supply, demand or price or rate thereof, or said business is conducted in violation of the first section of this act, said business is a public business, and subject to be controlled by the state, by the Corporation Commission or by an action in any district court of the state, as to all of its practices, prices, rates and charges.    And it is hereby declared to be the duty of any person, firm or corporation engaged in any public business to render its services and offer its commodities, or either, upon reasonable terms without discrimination and adequately to the needs of the public, considering the facilities of said business.

"Sec. 14.    In all prosecutions or proceedings under this act, it shall be sufficient to prove that a trust, monopoly, combination in restraint of trade or commerce existed without the period not barred by the statute of limitations, and was continued in any form into and during any portion of the period not so barred, and that the defendant belonged to it, or acted for or in connection with it without proving all the members belonging to it, or proving or producing any article or agreement or any written instrument on which it may have been based, or that it was evidenced by any written instrument at all.

"Sec. 15.  Any violation of this act, committed before its passage, and continued in any illegal form after its passage, is within its terms.

"Sec. 16.  The remedies provided by this act are applicable to all pending actions.

"Sec. 17.  Nothing in this act shall abridge or alter any remedy or remedies now or hereafter existing, either at common law or by statute, but the provisions of this act are in addition to such remedies.

"Sec. 18.  An emergency is hereby declared to exist for the passage of this act, for the preservation of the public safety of this state, and this act shall be in force and effect from and after its passage and approval.

"Approved June 10, 1908."

Section 2 of article 2, chapter 53, act approved June 6, 1908, Sess. Laws 1907-08, p. 514 (section 4042, Comp. Laws 1909), being entitled:

"An act to prohibit any person or corporation in this state from causing or compelling any person or persons to enter into an agreement not to join or be a member of any labor organization as a condition of such person securing employment or continuing in the employment of such corporation; declaring that no agreement, combination or contract between two or more persons to do or to procure to be done, or not to do or procure to be done, certain acts, shall be deemed as criminal; to prohibit false or deceptive representations by employers of labor; to prevent the guarding of other persons or property with arms or deadly weapons, except as permitted by this act; to provide for the right of recovery of all damages workmen may sustain in consequence of false or deceptive representation in the employment of such persons; and to provide penalties for violations of the provisions of this act"

—is in these words:

"Sec. 2.  No agreement, combination or contract by or between two or more persons to do or procure to be done, or not to do or procure to be done, any act in contemplation or further-ance of any trade dispute between employers and employees in the state of Oklahoma, shall be deemed as criminal nor shall those engaged therein be indicted or otherwise punishable for the crime of conspiracy, if such act committed by one person would not be punishable as a crime, nor shall such agreement, combination or contract be considered as in restraint of trade or commerce, nor shall any restraining order or injunction be issued with re-

lation thereto. Nothing in this act shall exempt from punishment otherwise than is herein excepted, any person guilty of conspiracy for which punishment is now provided by an act of the Legislature, but such act of the Legislature shall as to the agreement, combination and contracts hereinbefore referred to, be construed as if this act was therein contained: Provided, that nothing in this act shall be construed to authorize force or violence."

The principal proposition advanced by the learned counsel for the defendants is that the act of June 10, 1908, commonly called the Anti-Trust Act, is unconstitutional: First. Because the words in section 1, "which is against public policy," limit the provisions of the act to such acts as are against public policy. That therefore organized labor is exempt from its restrictions by reason of the provisions of section 2, art. 2, of the act of June 6, 1908, commonly called the Labor Act, which counsel insist, in effect, makes any agreement, combination, or contract, which would be illegal under the provisions of the Anti-Trust Act, legal and not in violation of any law if it is done in contemplation or in furtherance of any trade dispute, as such combinations of labor would not be against the public policy of the state as declared by its laws, or by any law which might thereafter be passed which would declare lawful any act which under the provisions of the Anti-Trust Act, without specific legislation to the contrary, would be illegal. That the Anti-Trust Act thus deprives the citizens of the state to whom its provisions do apply of the equal protection of the laws, in violation of the fourteenth amendment of the Constitution of the United States. Second. Because it denies those engaged in any business which might be held to be quasi public business of the equal protection of the laws, and deprives them of their property without due process of law by reason of the enormity of its penalties, in violation of the fourteenth amendment to the Constitution of the United States.

The question presented for decision is whether the aforesaid enactments are contrary to the Constitution of the United States, and null and void on account of being in contravention of the fourteenth amendment thereof.

Speaking generally, it may be said that this branch of juris-prudence, which permits the courts to pronounce an act of the Legislature null and void because in conflict with provisions of the Constitution, is peculiar to American institutions, and it has been declared by a distinguished writer that the discussion of that head of constitutional law, prescribing bounds which the Legislature itself cannot transcend, is peculiar to American juris-prudence. Sedgw. Stat. and Const. L. 405.

A further well-settled principle of American jurisprudence is that the courts cannot annul or pronounce void any act of the Legislature upon any other ground than that of repugnancy to the Constitution of the United States, or of the state.

Says Judge Cooley:

"Nor can a court declare a statute unconstitutional and void solely on the ground of unjust and oppressive provisions, or be-cause it is supposed to violate the natural, social, or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed or protected by the Con-stitution. The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legis-lative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the peo-ple of the state, except as those rights are secured by some con-stitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts can-not assume their rights. The judiciary can only arrest the exe-cution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. Any legislative act which does not encroach upon the powers apportioned to the other de-partments of the government, being *prima facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the Constitution, and the case shown to come within them. The government of the United States is one of enumerated powers; the governments of the states are possessed of all the general powers of legislation. When a law of Con-gress is assailed as void, we look in the national Constitution to

see if the grant of specified powers is broad enough to embrace it; but, when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the state we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the Constitution authorizes, either expressly or by clear implication; while the state Legislature has jurisdiction of all subjects on which its legislation is not prohibited. It has been said by an eminent jurist that when courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained. The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other. The duty of the court to uphold a statute when the conflict between it and the Constitution is not clear, and the implication which must always exist that no violation has been intended by the Legislature may require it in some cases, when the meaning of the Constitution is not in doubt, to lean in favor of such a construction of the statute as might not at first view seem most obvious and natural. For as a conflict between the statute and the Constitution is not to be implied, it would seem to follow, where the meaning of the Constitution is clear, that the court, if possible, must give the statute such a con-

struction as will enable it to have effect. This is only saying, in another form of words, that the court must construe the statute in accordance with the legislative intent; since it is always to be presumed the Legislature designed the statute to take effect, and not to be a nullity. The rule is not different when the question is whether any portion of a statute is void, than when the whole is assailed. The excess of power, if there is any, is the same in either case, and is not to be applied in any instance." (Cooley's Const. Lim. c. VII.)

It will be noted that the Labor Act containing section 2, *supra*, was approved June 6th, and the Anti-Trust Act was approved June 10, 1908. The Labor Act did not contain an emergency clause; the Anti-Trust Act did. The provisions of these respective acts as we view the law are in no way inconsistent. However, it might be argued that even if said section 2 of the Labor Act should be judicially held unconstitutional, yet that fact would not authorize the courts to pronounce the Anti-Trust Act unconstitutional also.

Says Mr. Bishop:

"A statute may be in conflict with the Constitution in part, and the rest of it be free from objection. In which case, if the parts are properly separable, the courts will sustain what is sound, and reject the unsound. This may be so, even where the sound and unsound are in one section together. But, if the unconstitutional parts are essential to the constitutional, all must fail. And, beyond what thus comes from necessity, the doctrine has been laid down, and it seems to be just, that, if the parts are so mutually related as to make it evident the Legislature intended them to constitute one whole, so that if all could not be carried into effect none would have received the legislative sanction, the case is within the same rule. On the other hand, absolute independence of the provisions is not a prerequisite to letting a part stand while the rest fall." (Bishop's Statutory Cr. par. 34.)

There is nothing in our Constitution which prohibits the Legislature from repealing or modifying the acts of its predecessors or its own. It is fundamental that the Legislature cannot pass an irrepealable law.

Says Judge Cooley:

"The Constitution, in conferring the legaslative authority, has prescribed to its exercise any limitations which the people

saw fit to impose, and no other power than the people can super-add other limitations. To say that the Legislature may pass irrepealable laws is to say that it may alter the very Constitution from which it derives its authority, since, in so far as one Legis-lature could bind a subsequent one by its enactments, it could in the same degree reduce the legislative power of its successors; and the process might be repeated until, one by one, the subjects of legislation would be excluded altogether from their control, and the constitutional provision that the legislative power shall be vested in two houses would be, to a greater or less degree, renderd ineffectual." (Cooley's Const. Lim. [7th Ed.] p. 174.)

In the case of *Munn v. Illinois*, 94 U. S. page 134 (24 L. Ed. 77), it is said by Chief Justice Waite that:

"A mere common-law regulation of trade or business may be changed by statute. A person has no property, no vested in-terest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the Legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy de-fects in the common law as they are developed, and to adapt it to the changes of time and circumstances."

Passing to the consideration of the particular objections made to the constitutionality of said acts, this court will con-cede that it is evident the Legislature intended the provisions of said section 2 and the provisions of the Anti-Trust Act should constitute one whole, and, if both could not be carried into ef-fect, neither would have received the legislative sanction, and that therefore said section 2 should be construed in connection with the Anti-Trust Act.

We also agree in the main with the defendants' counsel in their contention that the words in section 1, "which is against public policy," limit the provisions of the act to those acts, agree-ments, or combinations in the form of trust or conspiracy in re-straint of trade or commerce, which are by the statutes declared illegal.

The question of what is the public policy of a state, and what is contrary to it and therefore illegal, is manifested primarily by

its Constitution and its statutes and secondarily by its judicial decisons. "Public policy," said Lord Brougham, "is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good."

Says Mr. Noyes:

"A more precise definition cannot well be stated. Although the fundamental principles are unchangeable, public policy, in its very nature, is uncertain and fluctuating. It varies with the time. The growth of trade and commerce has made acts and contracts, which formerly were in conflict with public policy, recognized and approved methods of doing business. It is as impossible to give an exact definition of the phrase as it is to define fraud. When public policy is manifested by statute, the statute is itself the rule; when it is manifested by judicial decisions based upon a uniform course of reasoning, the formulation of a rule of public policy requires only the classification of governing principles." (Noyes on Intercorporate Relations, pars. 338, 340.)

Mr. Justice Peckham in the case of *United States v. Trans-Missouri Freight Assoc.*, 166 U. S. 290, at page 340, 17 Sup. Ct. 540, at page 559 (41 L. Ed. 1007), said:

"The public policy of the government is to be found in its statutes, and when they have not directly spoken in the decisions of the courts, and the constant practice of the governmental officials, but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts."

The phrase "public policy," as it is popularly used and defined, makes it a very vague, inaccurate, and indefinite term, much too uncertain for courts to consider as a basis of a judgment. However, the courts must look to the Constitution and the statutes to determine the public policy of the state. When acting within constitutional limitations, the Legislature settles and declares the public policy of the state. Therefore, when we speak of the public policy of the state on a given subject, we mean the law of the state, whether found in the Constitution or the statutes. A constitutional statute cannot be contrary to public policy, as it is public policy.

We cannot agree with the contention of the Attorney General that section 3 of the act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly called the Sherman Anti-Trust Act, which prescribes:

"Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such territory and another, or between any such territory or territories and any state or states or the District of Columbia, or with foreign nations, or between the District of Columbia, and any state or states or foreign nations, is hereby declared illegal"

—is still in force in this state. It will be conceded that during the continuance of the territorial government the Sherman Anti-Trust Act was in force in Oklahoma and Indian Territories; still it did not have the effect to nullify the Territorial Anti-Trust Act of 1890.

In the case of *Territory v. Long Bell Lumber Co.,* 22 Okla. 890, 99 Pac. 911, it was held by the Supreme Court of the state that the Territorial Anti-Trust Act approved December 25, 1890, is not in conflict, or inconsistent with the Constitution or the laws of the United States, nor with any act on the same subject applicable to territories enforceable by the federal authorities, and was a valid statute of the territory of Oklahoma. The territorial government while it existed, was entirely subordinate to Congress. Congress had the power to annul any statute enacted by the Territorial Legislature, and to make laws and provide for their execution within the territory. When Oklahoma and Indian Territories became transformed into the state of Oklahoma, said section 3 of the act of Congress known as the Sherman Anti-Trust Act ceased to have force within the boundaries of the state. By the provisions of the Enabling Act and the Constitution the Territorial Anti-Trust Act alone was adopted and continued in force in the state of Oklahoma.

The title and text of the Territorial Act is as follows:

"An act to prevent combinations in restraint of trade.

"Section 1. If any individual, firm, partnership, or any association of persons whatsoever, shall create, enter into, become a member of, or a party to, any pool, trust, agreement, combination or understanding with any other individual, firm, partnership or association of persons whatsoever, to regulate or fix the price of, or prevent or restrict, the competition in the sale of provisions, feed, fuel, lumber, or other building materials, articles of merchandise or other commodity, they shall be deemed guilty of [a] misdemeanor and upon conviction thereof shall be fined not less than fifty nor more than five hundred dollars.

"Sec. 2. It shall not be lawful for any corporation organized under the laws of this territory, or organized under the laws of any other territory or state, and doing business in this territory, to enter into any combination, contract, trust, pool or agreement with any other corporation or corporations, or with any individual, firm, partnership or association of persons, whatsoever, for the purpose of regulating or fixing the price of, or preventing or restricting competition, in the sale of provisions, feed, fuel, lumber, or other building materials, articles of merchandise, or other commodity, including the fixing of the rate of interest. [Any] president, manager, director, agent, receiver or other officer of any such corporation, violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than fifty nor more than five hundred dollars, for the first offense, and upon a sceond conviction shall be fined a sum equal to twice the amount of the first fine, and such corporation shall forfeit its corporate right and franchise, and its corporate existence, in this territory, shall thereupon cease and determine.

"Sec. 3. Any person purchasing provisions, feed, material, articles of merchandise, or any commodity from any individual, firm, partnership, or corporation, transacting business in violation of the provisions of this act, such person so purchasing shall not be liable for the price or payment of any such article or commodity and may plead this act, as a defense in any suit for price or payment. In any civil action brought under the provisions of this section, the court before whom such suit shall be pending may compel the plaintiff to testify, but if the plaintiff be a corporation then the court may compel any officer, agent, or employee of such corporation to attend, appear, and testify, or compel the production of any contract, or papers in evidence in such civil action: Provided, the evidence so obtained shall not

be used in any criminal prosecution against the person so testifying except in a criminal prosecution for perjury committed in giving such testimony.

"Sec. 4. Any person who shall have purchased from any individual, firm, partnership or corporation, doing business in violation of the provisions of this act, any provisions, feed, fuel, lumber or other building material, articles of merchandise, or other commodity and paid for the same, may maintain a civil action to recover the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable attorney's fee to be fixed by the court, which attorney's fee shall be taxed and collected as part of the costs in such case. In any civil action brought under the provisions of this section, the court before whom such suit be pending may compel the defendant to testify, but if the defendant be a corporation, then the court may compel any officer, agent or employee of such corporation to attend, appear, and testify or compel the production of any contract or papers as evidence in such civil action: Provided, the evidence so obtained shall not be used in any criminal action against the person so testifying, except in a criminal prosecution for perjury committed in giving such testimony.

"Sec. 5. It shall be the duty of the prosecuting attorneys in their respective counties, to enforce the foregoing provisions of this act, and any prosecuting attorney securing a conviction under provisions of this act, shall be entitled in addition to such fee or salary as by law he is allowed for such prosecution, to one-fifth of the fine received." (Wilson's Rev. & Ann. St. 1903, secs. 6739-6743.)

By section 17 of the Anti-Trust Act the Territorial Act of 1890 is still continued in force. However, it is conceded that if any of the provisions of the act of 1908, which is the latest act on the subject of trusts, are in conflict with any of the provisions of the act of 1890, the latter will stand repealed, but, where there is no conflict between the two acts, it is apparent from section 17 of the act of 1908 that the intent and purpose was to keep in full force and effect all of the provisions of both acts.

These statutes settle and declare the public policy of the state on the subject of trusts, monopolies, combinations, or conspiracy in restraint of trade.

The contention of the defendants' counsel that section 2 of the Labor Act exempted combinations in restraint of trade which were in furtherance of a trade dispute between employers · and employees from the operation of the criminal or penal statutes directed against combinations in restraint of trade, and that this renders the act unconstitutional, is, we think, not well founded nor warranted by any canon of construction.

Say counsel in conclusion:

"If the law protects combinations of labor or of any class of citizens of the state, it must also protect combinations of capital, otherwise a class of citizens who are not afforded this protection are plainly deprived of that equal protection of the laws which the Constitution of the United States guarantees to every citizen of the United States"

—citing *Connolly v. Union Sewer Pipe Co.,* 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, wherein the Supreme Court of the United States held . that the Anti-Trust Act of Illinois (Laws 1893, p. 182), exempting agricultural combinations from its prohibitions, was unconstitutional, being in conflict with the fourteenth amendment.

We think the principle involved in the question here presented is clearly distinguished from that upon which the decision in the Connolly case was based. · The view of the court in that case was that section 9 of the Illinois Anti-Trust Act in these words, "9. The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser," was not within any legal rule of permissible classification and therefore discriminative.

Mr. Justice McKenna wrote a dissenting opinion which is an admirable exposition of the legal principles of classification. This decision, rendered 20 years ago, has never ·been squarely followed by the Supreme Court of the United States, but, by numerous decisions, the general doctrine declared has been limited and qualified. Mr. Justice Harlan, who wrote the opinion of the court therein, says:

"What may be regarded as a denial of the equal protection of the laws is a question not always easily determined, as the de-

cisions of this court and of the highest courts of the states will show. It is sometimes difficult to show that a state enactment, having its source in a power not controverted, infringes rights protected by the national Constitution. No rule can be formulated that will cover every case."

In the recent case of *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, a statute of the state of New York was construed and held valid. The contention was that the statute in question is arbitrary in its classification and consequently denies the equal protection of the law to those whom it affects. Mr. Justice Van Devanter, in delivering the opinion of the court, used this language:

"The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: (1) The equal protection clause of the fourteenth amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. (2) A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. (3) When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the daw was enacted must be assumed. (4) One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. *Bachtel v. Wilson*, 204 U. S. 36, 41, 27 Sup. Ct. 243, 51 L. Ed. 357, 359; *Louisville & N. R. Co. v. Melton*, 218 U. S. 36, 30 Sup. Ct. 676, 54 L. Ed. 921; *Ozan Lumber Co. v. Union County Nat. Bank*, 207 U. S. 251, 256, 28 Sup. Ct. 89, 52 L. Ed. 195, 197; *Munn v. Illinois*, 94 U. S. 113, 132, 24 L. Ed. 77, 86; *Henderson Bridge Co. v. Henderson*, 173 U. S. 592, 615, 19 Sup. Ct. 553, 43 L. Ed. 823, 831."

Of course it is conceded that if the decision in the Connolly case is directly applicable to our anti-trust and labor statutes, this court is concluded thereby, as we must defer to the decision of the Supreme Court of the United States, and follow its interpretation and application of the federal Constitution. How-

ever, we are clearly of opinion that the direct question here presented has never been passed upon by that court.

This brings us to the consideration of the principles upon which this provision (section 2) of the Labor Act rests, in order that we may determine what is within its operative effect:

Organizations of employees under the ancient common law, indictable as conspiracies, are now universally recognized by law. The right of employees for their own protection to associate together or combine to secure shorter hours, higher wages, and more favorable conditions generally than their employers might be willing to concede, has never in this country, except in a few early cases, been regarded in the nature of an illegal combination or conspiracy in restraint of trade.

In the case of *Thomas v. Cincinnati, N. O. & T. P. Ry. Co.,* (C. C.) 62 Fed. 817, Judge Taft (now President), on the right of employees to organize, used the following language:

"Now, it may be conceded in the outset that the employees of the receiver had the right to organize into or to join a labor union which should take joint action as to their terms of employment. It is of benefit to them and to the public that laborers should unite in their common interest and for lawful purposes. They have labor to sell. If they stand together, they are often able, all of them, to command better prices for their labor than when dealing singly with rich employers, because the necessities of the single employee may compel him to accept any terms offered him. The accumulation of a fund for the support of those who feel that the wages offered are below market prices is one of the legitimate objects of such an organization. They have the right to appoint officers who shall advise them as to the course to be taken by them in their relations with their employer. They may unite with other unions. The officers they appoint, or any other person to whom they choose to listen may advise them as to the proper course to be taken by them in regard to their employment, or, if they choose to repose such authority in any one, may order them, on pain of expulsion from their union, peaceably to leave the employ of their employer, because any of the terms of their employment are unsatisfactory."

In the case of *Ames v. Union Pac. Ry.* (C. C.) 62 Fed. 7, Judge Caldwell said:

"The period of compulsory personal service, save as a punishment for crime, has passed in this country. In this country it is not unlawful for employees to associate, consult, and confer together with a view to maintain or increase their wages, by lawful and peaceful means, any more than it was unlawful for the receivers to counsel and confer together for the purpose of reducing their wages. A corporation is organized capital; it is capital consisting of money and property. Organized labor is organized capital; it is capital consisting of brains and muscle. What it is lawful for one to do, it is lawful for the other to do. If it is lawful for the stockholders and officers of a corporation to associate and confer together for the purpose of reducing the wages of its employees, or of devising other means of making their investments profitable, it is equally lawful for organized labor to associate, consult, and confer with a view to maintain or increase wages. Both act from the prompting of enlightened selfishness, and the action of both is lawful when no illegal or criminal means are used or threatened."

Says Mr. Martin in his treatise "On Modern Laws of Labor Unions," pages 10, 11, and 12:

"In some jurisdictions where there are statutes authorizing it, and in others, in the absence of statutory authorization, it is now well settled that workmen may combine and associate themselves together for the purpose of bettering their condition either financially or socially by legitimate and fair means. Such a combination or association, it has been held, is not a monopoly, or in restraint of trade; personal service, an occupation, cannot be the subject of a monopoly. The right of workmen to form unions is expressly conferred by statute in many jurisdictions, and in a majority of the states the right is impliedly recognized by legislation enacted for the protection of unions from infringement of their labels, for it is obvious that, where statutes expressly create or recognize the right of labor unions to be protected in the use of labels for labor union purposes, any suggestion that the union is an unlawful association falls of itself. It has also been held that the right to combine into unions has been raised to the dignity of a constitutional right by state constitutional provisions that all men are born free and equal and have certain natural, essential, and unalienable rights among which is the right of acquiring, possessing, and protecting property. But aside from any constitutional or statutory provision, the better view is that the right of laborers to organize into unions is an exercise of the common-law right of every citizen to pursue his calling, whether

of labor ·or business, as he ·in his judgment thinks fit, and the law not only permits, but encourages, combinations of this character. An underlying law of human society, it is said, moves men to unite for the better achievement of a common aim, and this social principle justifies organized action. Organization or combination is a law of human society. It is open to all orders of men who desire to accomplish some lawful purpose through the greater strength and effectiveness which organization offers over individual effort. A very strong reason for permitting labor combinations is this: In an age when vast combinations of capital are common and the number of individual employers of labor, and, in consequence, competition for labor by employers enormously reduced, combination on the part of labor is an absolute necessity if the wage-earner is to obtain his fair share in the distribution of the earnings which are the joint product of capital and labor. Combination on the part of capital is powerful. Combination on the part of labor is the necessary and.desirable counterpart if the battle is to be carried on in a fair and equal way. The natural tendency of combined capital is to seek to obtain the cheapest labor; and, unless resisted by combination on the part of the wage-earner, it would inevitably result in oppression and injustice. As was said by .Attorney General Olney: 'Today the mass of wage-earners can no longer be dealt with by capital as so many isolated units. The time is past when the individual workman is called upon to pit his feeble strength against the might of organized capital.' "

The Sherman Anti-Trust Act prescribes:

"Section 1. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal."

This act has been in effect for twenty years and has been upheld by all the decisions of the federal courts, wherein it was considered, although there is a wide divergence of decision .as to its interpretation and application.

In the case of *United States v. Addyston Pipe & Steel Co.*, 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122, it was held:

"Contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal, or as giving rise to an action for damages to one prejudicially affected thereby, but were simply void, and not enforceable. The effect of the anti-trust law of 1890 is to render such contracts,

as applied to interstate commerce, unlawful in an affirmative or positive sense, and punishable as a misdemeanor, and also to create a right if civil action for damages in favor of persons injured thereby, and a remedy by injunction in favor both of private persons and the public against the execution of such contracts and the maintenance of such trade restraints."

In other words, it was against public policy under the common law to do the things forbidden by the Sherman Anti-Trust Act, but it was not a crime. The opinion was by Judge Taft. On appeal, the Supreme Court of the United States affirmed the doctrine declared by the Circuit Court of Appeals. *Addyston Pipe & Steel Co. v. United States,* 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136.

In the noted case of *United States v. Trans-Missouri Freight Association,* 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, it was held that:

"The prohibitory provisions of said act of July 2, 1890, apply to all contracts in restraint of interstate or foreign trade or commerce without exception or limitation; and are not confined to those in which the restraint is unreasonable."

To the same effect is the case of *United States v. Joint Traffic Association,* 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. The decision in each of these cases was by divided court, five to four, Mr. Justice Peckham delivering the opinions. These cases are cited by counsel for the defendants in support of their argument.

In the case of *Northern Securities Co. v. United States,* 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, the decision was by divided court of five to four, but a different five and a different four from the other two cases. The opinion of the court was rendered by Mr. Justice Harlan. Mr. Justice Brewer concurring, dissented in part to the reasoning, and in his concurring opinion says:

"Instead of holding that the Anti-Trust Act included all contracts reasonable or unreasonable, in restraint of interstate trade, the ruling should have been that the contracts there presented were unreasonable restraints of interstate trade and as such within the scope of the act. That act, as appears from its

title, was leveled at only 'unlawful restraints and monopolies.' Congress did not intend to reach and destroy those minor contracts in partial restraint of trade which the long course of decisions at common law had affirmed were reasonable and ought to be upheld. The purpose rather was to place a statutory prohibition, with prescribed penalties and remedies, upon those contracts which were in direct restraint of trade, unreasonable, and against public policy. Whenever a departure from common-law rules and definitions is claimed, the purpose to make the departure should be clearly shown. Such a purpose does not appear, and such a departure was not intended."

In the recent case of *Standard Oil Co. v. United States*, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, the doctrine declared in the Trans-Missouri Freight and Joint Traffic Associations cases, *supra*, is expressly overruled, and it is held that the prohibitory provisions of the Sherman Anti-Trust Act apply only to undue or unreasonable restraints of interstate or foreign trade or commerce, and that the standard of reason which had theretofore been applied at the common law and in the United States in dealing with subjects of the character embraced by the prohibitions of said act against such combinations in restraint of trade was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the said act provided.

The reasoning of Mr. Chief Justice White, who wrote the opinion of the court, applies with equal force to the question here presented. Therein the eminent Chief Justice in part says:

"There can be no doubt that the sole subject with which the first section deals is restraint of trade as therein contemplated, and that the attempt to monopolize, and monopolization, is the subject with which the second section is concerned. It is certain that those terms, at least in their rudimentary meaning, took their origin in the common law, and were also familiar in the law of this country prior to and at the time of the adoption of the act in question. We shall endeavor then, first, to seek their meaning, not by indulging in an elaborate and learned analysis of the English law and of the law of this country, but by making a very brief reference to the elementary and indisputable conceptions of both the English and American law on the subject

prior to the passage of the Anti-Trust Act. It is certain that at a very remote period the words 'contract in restraint of trade' in England came to refer to some voluntary restraint put by contract by an individual on his right to carry on his trade or calling. Originally all such contracts were considered to be illegal, because it was deemed they were injurious to the public, as well as to the individuals who made them. In the interest of the freedom of individuals to contract, this doctrine was modified so that it was only when a restraint by contract was so general as to be coterminous with the kingdom that it was treated as void. That is to say, if the restraint was partial in its operation, and was otherwise reasonable, the contract was held to be valid. * * * In substance, the propositions urged by the government are reducible to this: That the language of the statute embraces every contract, combination, etc., in restraint of trade, and hence its text leaves no room for the exercise of judgment, but simply imposes the plain duty of applying its prohibitions to every case within its literal language. The error involved lies in assuming the matter to be decided. This is true, because, as the acts which may come under the classes stated in the first section and the restraint of trade to which that section applies are not specifically enumerated or defined, it is obvious that judgment must in every case be called into play in order to determine whether a particular act is embraced within the statutory classes, and whether, if the act is within such classes, its nature or effect causes it to be a restraint of trade within the intendment of the act. To hold to the contrary would require the conclusion either that every contract, act, or combination of any kind or nature, whether it operated a restraint on trade or not, was within the statute, and thus the statute would be destructive of all right to contract or agree or combine in any respect whatever as to subjects embraced in interstate trade or commerce, or, if this conclusion were not reached, then the contention would require it to be held that, as the statute did not define the things to which it related, and excluded resort to the only means by which the acts to which it relates could be ascertained—the light of reason—the enforcement of the statute was impossible because of its uncertainty. The merely generic enumeration which the statute makes of the acts to which it refers, and the absence of any definition of restraint of trade as used in the statute, leaves room for but one conclusion, which is that it was expressly designed not to unduly limit the application of the act by precise definition, but, while clearly fixing a standard, that is, by defining the ulterior

boundaries which could not be transgressed with impunity, to. leave it to be determined by the light of reason, guided·by the principles of law and the duty to apply and enforce the public policy embodied in the statute, in every given case, whether any particular·act or contract was within the contemplation of the statute. But, it is said, persuasive as these views may be, they may not be held applied, because the previous decisions of this court have given to the statute a meaning which expressly excludes the construction which must result from the reasoning stated. The cases are *United States v. Trans-Missouri Freight Assoc.*, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, and *United States v. Joint Traffic Assoc.*, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259. * * * But, aside from reasoning, it is true to say that the cases relied upon do not, when rightly construed, sustain the doctrine contended for, is established by all of the numerous decisions of this court which have applied and enforced the Anti-Trust Act, since they all, in the very nature of things, rest upon the premise that reason was the guide by which the provisions of the act were in every case interpreted. Indeed, intermediate the decision of the two cases, that is, after the decision in the Freight Association case, and before the decision in the Joint Traffic case, the case of *Hopkins v. United States,* 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, was decided, the opinion being delivered by Mr. Justice Peckham who wrote both the opinions in the Freight Association and in the Joint Traffic cases. And, referring in the Hopkins case to the broad claim made as to the rule of interpretation announced in the Freight Association case, it was said (page 592): 'To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased, would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce in order to come within the act.' And in the Joint Traffic case this statement was expressly reiterated and approved and illustrated by example. Like limitation on the general language used in Freight Association and Joint Traffic cases is also the clear result of *E. Bement & Sons v. National Harrow Co.,* 186 U. S. 70, 92, 22 Sup. Ct. 747, 46 L. Ed. 1058, 1069, and especially of *Cincinnati, P. B. S. & P. Packet Co. v. Bay,* 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428. If the criterion by which it is to be determined in all cases whether every contract, combination, etc., is a restraint of trade within the intendment of the law, is the direct

or indirect effect of the acts involved, then, of course, the rule of reason becomes the guide, and the construction which we have given the statute, instead of being refuted by the cases relied upon, is by those cases demonstrated to be correct. This is true, because the construction which we have deduced from the history of the act and the analysis of its text is simply that in every case where it is claimed that an act or acts are in violation of the statutes the rule of reason, in the light of the principles of law and the public policy which the act embodies, must be applied. From this it follows, since that rule and the result of the test as to direct or indirect, in their ultimate aspect, come to one and the same thing, that the difference between the two is therefore only that which obtains between things which do not differ at all. If it be true that there is this identity of result between the rule intended to be applied in the Freight Association case, that is, the rule, of direct and indirect, and the rule of reason which, under the statute as we construe it, should be here applied, it may be asked how was it that, in the opinion in the Freight Association case, much consideration was given to the subject of whether the agreement or combination which was involved in this case could be taken out of the prohibitions of the statute upon the theory of its reasonableness. The question is pertinent and must be fully and frankly met; for if it be now deemed that the Freight Association case was mistakenly decided, or too broadly stated, the doctrine which it announced should be either expressly overruled or limited."

To the same effect is the case of *United States v. American Tobacco Co.,* 221 U. S. 106, 31 Sup. Ct. 630, 55 L. Ed. 663.

The great case of *Allen v. Flood,* decided by the House of Lords, (1898) A. C. p. 1, is, we think, the best exposition of the common law by the courts of England on this question. The report of the case covers 180 pages of the report cited, and shows that all the English and numerous American cases were reviewed. It is safe to say that few cases have ever been more thoroughly considered. The case, and the conclusion reached, is stated in the headnote as follows:

"The respondents were shipwrights employed 'for the job' on the repairs to the woodwork of a ship, but were liable to be discharged at any time. Some ironworkers who were employed on the ironwork of the ship objected to the respondents being employed, on the ground that the respondents had previously

worked at ironwork on a ship for another firm, the practice of shipwrights working on iron being resisted by the trade union of which the ironworkers were members. The appellant, who was a delegate of the union, was sent for by the ironworkers and informed that they intended to leave off working. The appellant informed the employers that unless the respondents were discharged all the ironworkers would be called out or knock off work (it was doubtful which expression was used) ; that the employers had no option; that the ironmen were doing their best to put an end to the practice of shipwrights doing ironwork, and that wherever the respondents were employed the ironmen would cease work. There was evidence that this was done to punish the respondents for what they had done in the past. The employers, in fear of this threat being carried out which (as they knew) would have stopped their business, discharged the respondents and refused to employ them again. In the ordinary course, the respondents' employment would have continued. The respondents having brought an action against the appellant, the jury found that he had maliciously induced the employers to discharge the respondents and not to engage them, and gave the respondents a verdict for damages. *Held*, reversing the decision of the Court of Appeal, (1895), 2 Q. B. 21 (Lord Halsburg, L. C., and Lords Ashbourne and Morris dissenting), that the appellant had violated no legal right of the respondents, done no unlawful act, and used no unlawful means, in procuring the respondents' dismissal; that his conduct was therefore not actionable, however malicious or bad his motive might be, and that, notwithstanding the verdict, the appellant was entitled to judgment."

In the case, Lord Macnaghten in his opinion used this language in regard to the appellant, Allen:

"He had nothing to do with the origin of the ill-feeling against Flood and Taylor. He did nothing to increase it. He went to the dock simply because he was sent for by one of the men of his union. It seems to be considered the duty of a district delegate to listen to the grievances of the members of his union within his district, and to settle the difficulty, if possible. The jury found that the settlement of this dispute was a matter within Allen's discretion. The only way in which he could settle it was by going and seeing the manager. There was surely nothing wrong in that. There was nothing wrong in his telling the manager that the ironmen would leave their work unless the two shipwrights against whom they had a grudge were dismissed,

if he really believed that that was what his men intended to do. As far as their employers were concerned, the ironmen were per-perfectly free to leave their work for any reason, or for no reason, or even for a bad reason; any one of them might have gone singly to the manager, or they might have gone to him all together (if they went quietly and peaceably), and told him that they would not stay any longer with Flood and Taylor at work among them. If so, it is difficult to see why fault should be found with Allen for going in their place and on their behalf and saying what they would have said themselves. * * * No action would lie against the company for discharging the two shipwrights. No action would lie against the ironmen for striking against them. No action would lie against the officers of the union for sanctioning such a strike. * * * I do not think that there is any foundation in good sense or in authority for the proposition that a person who suffers loss by reason of another doing or not doing some act which that other is entitled to do, or to abstain from doing at his own will and pleasure, whatever his real motive may be, has a remedy against a third person who, by persuasion or some other means not in itself unlawful, has brought about the act or omission from which the loss comes, even though it could be proved that such person was actuated by malice towards the plaintiff, and that his conduct, if it could be inquired into, was without justification or excuse * * * The case may be different where the act itself to which the loss is traceable involves some breach of contract or some breach of duty, and amounts to an interference with legal rights. There the immediate agent is liable, and it may well be that the person in the background who pulls the strings is liable too."

Labor in this country is labor by persons having the inherent and indefeasible right to choose whether they will labor or not, and to choose the terms on which they will consent to labor, if labor be their choice.

The character of the rights guaranteed to employees under this section is not to be tested according to the standards adopted in other countries in former times, where labor partook of many of the disabilities of serfdom and peonage. But it is to be judged by the more enlightened conceptions of the present, when the dignity of labor is recognized, and where the equal right of all men to life, liberty, and pursuit of happiness is guaranteed by the fundamental law of a free country.

Nevertheless, we think the public policy of this state as declared in section 2 of the Labor Act is not inconsistent with the principles of common law, as declared in *Allen v. Flood, supra,* and in this view there is no arbitrary classification or discrimination under the doctrine declared by the Supreme Court of the United States in *Standard Oil Co. v. United States, supra,* that only undue and unreasonable restraints of interstate or foreign trade or commerce are prohibited by the provisions of the Sherman Anti-Trust Act. As to what constitutes unlawful means, and wrongful or criminal acts, in the attainment of the lawful object and purpose of combinations of employees, has been a frequent subject of judicial inquiry, and the question has been given widely different answers by the courts.

For this reason there are few things so doubtful in the criminal law as the point at which a combination of employees becomes unlawful, and as to what means are unlawful to accomplish a purpose not in itself unlawful. This section of the Labor Act is a legislative rule, direct and definite, that in contemplation or furtherance of a trade dispute, whatever one employee may lawfully do alone, he may do in combination with other employees, provided they have no unlawful object in view.

Says Mr. Martin:

"The right to combine, considered in the preceding section, is in no way affected by a statute forbidding a combination, agreement, or understanding to regulate or fix the price of any article of merchandise, or commodity, or of merchandise to be manufactured, mined, or produced, or sold in a state, and declaring that parties to such combination, agreement, or understanding shall be guilty of conspiracy. The statute is aimed at unlawful conspiracies or combinations in restraint of trade and has no application to labor unions and combinations to fix the price of labor." (Martin on Modern Law of Labor Unions, par. 7.)

In the case of *Rohlf v. Kasemeier,* 140 Iowa, 182, 118 N. W. 276, 23 L. R. A. (N. S.) 1284, 132 Am. St. Rep. 261, 17 Ann. Cas. 750, the Supreme Court of Iowa, construing an anti-trust statute of that state, says:

"The statute in question was aimed at unlawful conspiracies or combinations in restraint of trade, and was manifestly not intended to cover labor unions. It is the right of miners, artisans, laborers, or professional men to unite for their own improvement or advancement, or for any other lawful purpose, and it has never been held, so far as we are able to discover, that a union for the purpose of advancing wages is unlawful under any statutes which have been called to our attention. As said by Judge Taft in the Phelans case (C. C.) 62 Fed. 803: 'Such unions, when rightly conducted, are beneficial in character.' And it would be a strained and unnatural conclusion to hold that a statute aimed at pools and trusts should be held to include agreements as to prices for labor because the word 'commodity' is used therein. As the right to combine for the purpose of securing higher wages is recognized as lawful at common law, a statute enacted to prohibit pools and trusts should not be held to apply to combinations to fix the wages for labor, unless it clearly appears that such was the legislative intent. Whatever of doubt there may be regarding the power of the Legislature to do so, we do not think that the act in question covers combinations to fix the labor price whether that labor be skilled or unskilled."

In the case of *State v. Van Pelt et al.*, 136 N. C. 663, 49 S. E. 183 (68 L. R. A. 760, 1 Ann. Cas. 495), a criminal conspiracy case, Mr. Justice Connor used the following language:

"In this country, in which judges are in respect to their source of appointment and tenure sensitive to changes of popular opinion and temper, amid the ever increasing acuteness of the struggle between opposing social and industrial forces, the lines which separate a criminal from a noncriminal conspiracy should be clearly defined. To a timid, conservative, judicial mind, trained to regard even the slightest disturbance of such forcees as portending danger to the peace of the state, a combination of the most harmless character would assume 'unlawful' form and force. To a different type of judicial mind, believing that the safety and highest interest of the state are promoted by the freest possible play of mind and action, in trade competition, 'however selfish and egotistical, if unattended by circumstances of dishonesty, intimidation, molestation, or other such illegalities,' the same combination would appear not only lawful, but stimulating, to trade in the community. The study of the struggle between the ruling class and the laborers in England, culminating in the passage of the statute of 38 and 39 Vict., is of interest to the

student and value to the lawmaker and judge. It is declared by that statute that an agreement or combination to do any act in furtherance of a trade dispute shall not render the person committing it indictable for a conspiracy, if such acts committed by one would not be punishable as a crime. 'These latter words may almost be described as "The workman's charter of liberty," for they dispose at once and forever of the contention that a combination to do acts, not illegal in themselves, is entitled to be regarded by the law as a conspiracy.' Cent. Law Reform, 253. A great English statesman said that for the first time employers and employees sat under equal laws."

And in conclusion said:

"In view of the wide divergence of judicial opinion, by reason whereof the law is oppressed with a distressing uncertainty, it would seem that the Legislature should abrogate the common law on the subject and enact a plain, clearly expressed, and carefully guarded statute in lieu thereof."

The rule prescribed by section 2 of the Labor Act is clearly intended to define in direct and certain terms the right of employees to combine, contract, or act collectively in contemplation or furtherance of any trade dispute, and in so doing the right to do collectively or concertedly any act not wrongful or criminal if committed by one person, and that such acts shall not be punished as a criminal conspiracy. In other words it declares that what is lawful for one person to do in such a case is not unlawful for two or more collectively or concertedly to do. It does not authorize such combinations of employees to effectuate their object or purpose, however lawful, by means of force, violence or fraud. We think that employers and employees stand upon a plane of perfect equality under this provision of the law.

The second contention is that what is public policy and what acts are made criminal under the provisions of the Anti-Trust Act are without definition and so indefinite that the question of legality or illegality must be determined by judicial inquiry, and that the penalties prescribed are so drastic and severe as to cause a man to shrink from testing the act in the courts, that for this reason the act is in conflict with the constitutional provision guaranteeing the equal protection of the law, citing *Ex Parte*

*Young,* 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

We think this contention has been fully answered in what we have already said. The public policy of the state on the subject of trusts, monopolies, and conspiracy in restraint of trade is sufficiently defined by the statute.

As we understand the facts in the case of *Ex parte Young,* the state of Minnesota enacted a law fixing certain rates on domestic traffic within the state. It was alleged that those rates were confiscatory, and that they interfered with interstate commerce, and that the Attorney General and railroad commissioners were about to enforce these rates and that Mr. Shepard, a stockholder in the Northern Pacific, would thereby have his property confiscated. He brought an injunction suit in the federal court against the railroad commissioners and the Attorney General, an injunction was allowed, and Attorney General Young, in disregard of the same, instituted a mandamus suit against the Northern Pacific Railway Company. For this Attorney General Young was adjudged in contempt and committed, whereupon he sued out a writ of *habeas corpus* in the Supreme Court of the United States, contending that the original action was against the state of Minnesota, and that the state could not be sued without having consented to the same. The question upon which the case turned was where the state was being sued in a case where it was alleged that the state, through its railroad commissioners and Attorney General, was about to compel the railroad to transport persons and property for less than an adequate compensation. We think the doctrine of that case has no application to the case at bar, and that this contention is without merit. If the views herein expressed are sound, the statutes in question are a valid exercise of legislative power and authority.

It is our conclusion that there is no conflict with the Constitution of the United States, and, until compelled by direct judicial decision of the Supreme Court of the United States to the contrary, we shall esteem it a privilege and consider it a

solemn obligation and duty to uphold the validity of our anti-trust laws.

It is next contended that the indictments are void because they each charge more than one offense. The facts charged in each indictment constitute a criminal conspiracy in restraint of trade, both by reason of what is alleged was agreed to be done and the acts alleged to have been done in pursuance of the alleged agreement, and we think but one offense is charged.

In the case of *United States v. MacAndrews* (C. C.) 149 Fed. 823, Judge Hough, discussing the question of duplicity in an indictment charging a violation of the Sherman Anti-Trust Act, says:

"Time of combination and monopoly. It is true that the gist of the alleged offenses is the combination or the attempt at monopoly, but it is not true that the offenses are complete when the combination is mentally formed or the mental intention to monopolize arises. The statutory offense, and the one charged herein, does not depend upon 'a single agreement, but [on] a course of conduct intended to be continued'; yet, nevertheless, 'the thing done and intended to be done is perfectly definite.' *Swift v. United States,* 196 U. S. at page 400, 25 Sup. Ct. at page 281, 49 L. Ed. 518. This case arose on the civil side of the court, but it is to be remembered that the same facts and acts which expose violators of this statute to civil suit also render them subject to indictment. In this case, while the time is indefinite, the thing done is definite, and that is all that the statute requires. To show that an exact time may be, and therefore must be, assigned for the commission of the offense of combination, the defendants argue upon the meaning of the word 'engage' as used in the statute, and strenuously urge that, since the offense prohibited is that of 'engaging in' a combination, it must be complete as soon as the accused employs his attention or effort in or about the same, that such employment of attention or effort is capable of precise assignment in point of time, and they challenge the prosecution to name the day. The statute is not directed against such an abstraction as this. It does not require on the part of the prosecution clairvoyance to discover or locate the offense. Its prohibition is not directed against a state of mind, but against a state of facts. The facts do not simultaneously occur; the events are not contemporaneous. It may, and naturally would, require time for the working parts of the combination to become co-operative,

or for the monopoly to become more than a hope; and what is forbidden and renders the actors obnoxious to the criminal law is not an undiscoverable thought or hope, but a perfectly obvious result of condition. The condition or state of facts against which the statute is directed is a continuing condition, and therefore the offense of creating and maintaining that condition is necessarily a continuing offense, and does not, from its very nature, require greater particularity in assignment than is used in this indictment. Combination not described. The argument that the indictment describes only the results and effects of the combination, but not the combination itself, rests, I think, on a misreading of that instrument. Admitting that it is necessary to charge, not only the commission of the offense, but 'all the circumstances constituting the same (*United States v. Greenhut* [D. C.] 51 Fed. 205; *Re Greene* [C. C.] 52 Fed. 104), and excluding from consideration the 'overt acts,' the combination count not only charges the offense in ampler words than those of the statute, but shows by the 'ways in which' the offense was committed all the necessary circumstances; *i. e.,* that the defendant destroyed competition, apportioned customers, limited production, and required uniform contracts. The 'means by which' of the indictment are explanatory of the above clear averments which show both the nature of the combination and the method of its operation. * * * Duplicity, etc. The analysis of the indictment first above made convinces me that each alleged offense is sufficiently charged. The suggestion of duplicity rests upon the assumption that each one of the alleged 'overt acts' is charged as a separate indictable offense. The same analysis shows the error in this argument. The true reason for the rule against duplicity is that the 'jury cannot split up a count in an indictment, and find the accused guilty of a part and not guilty of the balance; their verdict must be an entirety.' *State v. Smith,* 61 Me. 386. I can see no possibility of the jury being thus misled in this case."

The question here presented was considered in the case of *United States v. Kissel,* 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168. Mr. Justice Holmes, delivering the opinion of the court, said:

"The defendants argue that a conspiracy is a completed crime as soon as formed, and that it is simply a case of unlawful agreement, and that therefore the continuando may be disregarded, and a plea is proper to show that the statute of limitations has run. Subsequent acts in pursuance of the agreement may renew the conspiracy or be evidence of a renewal, but do

not change the nature of the original offense. So, also, it is said the fact that an unlawful contract contemplates future acts, or that the results of a successful conspiracy endure to a much later date, does not affect the character of the crime. The argument, so far as the premises are true, does not suffice to prove that a conspiracy, although it exists as soon as the agreement is made, may not continue beyond the moment of making it. It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it. It also is true, of course, that the mere continuance of the result of the crime does not continue the crime. *United States v. Irvine,* 98 U. S. 450, 25 L. Ed. 193, 3 Am. Cr. Rep. 334. But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one. Take the present case. A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business, and will continue their combined efforts to drive the competitor out until they succeed. If they do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success. A conspiracy in restraint of trade is different from and more than a contract in restraint of trade. A conspiracy is construed by an agreement, it is true, but it is the result of an agreement, rather than the agreement itself, just as a partnership, although constituted by a contract is not the contract, but is a result of it. The contract is instantaneous, the partnership may endure as one and the same partnership for years. A conspiracy is a partnership in criminal purposes. That as such it may have continuation in time is shown by the rule that an overt act of one partner may be the act of all without any new agreement specifically directed to that act."

The lower court held the indictment in the first case defective because no time is alleged when the offense was committed. In this we think the lower court is clearly in error.

The indictment in this case alleges that "on the 15th day of November, 1907, and continuously from said date up to the filing of this indictment," which was the 23d day of October, 1909, "the defendant," and then it named one after another and

7 Cr.—3

alleges that they were and are corporations, and that they, and the sentence does not stop, "committed the following acts, and entered into the following conspiracies," etc., in the county of Logan, in the said state, intentionally, feloniously, and with the intent to monopolize the market for and of cotton and its products, "that is to say, they * * * have sought to acquire and have acquired a virtual monopoly in the marketing and ginning of cotton and seed cotton and in the marketing of the products thereof, in that they, acting together, * * * have acquired control of about 90 per cent. of all the gins * * * and have among themselves divided the field, * * * that is to say," and then is a description of one town after another, and what is being done there, and then, finally, that said "defendants then and there by said acts have completely annihilated competition in cotton and its products in the county of Logan except at the town of Mulhall."

As there is but one period given in the whole indictment, and that is the time between the 15th day of November, 1907, and the 23d day of October, 1909, the words "then and there" must refer to that period.

The common-law rule as to the necessity of specifically stating the time when the offense is committed is now to a great extent modified or dispensed with by reason of statutory provisions. In this indictment, we believe the time is sufficiently stated.

For the reasons stated, the judgment of the district court of Logan county, sustaining demurrers to the indictment in each of these cases, is hereby overruled, and the cases remanded with direction to the lower court to proceed in accordance with the views herein expressed.

FURMAN, P. J., and ARMSTRONG, J., concur.